**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JONATHAN JAY, Individually And On Behalf of All Others Similarly Situated,　　　　　　　　　　Plaintiff,　　vs.　　CANOPY GROWTH CORPORATION, BRUCE LINTON, MARK ZEKULIN, MIKE LEE, and TIM SAUNDERS　　　　　　　　　　Defendants | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

**CIVIL ACTION NO. _____**

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

## INTRODUCTION

1.     This is a federal class action on behalf of purchasers and/or acquirers of the securities of Canopy Growth Corporation ("CGC" or the "Company") between **September 8, 2017 and November 13, 2019,** inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  As alleged herein, Defendants (defined *infra*) published a series of materially false and misleading statements that Defendants knew and/or recklessly disregarded were materially false and misleading at the time of such publication, and that omitted to reveal material information necessary to make Defendants' statements, in light of such material omissions, not materially false and misleading.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the United States Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b).  CGC securities trade on the New York Stock Exchange ("NYSE"), which is located within this District.

5.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Jonathan Jay, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of CGC at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant CGC is organized under the laws of Canada and is headquartered in Smith Falls, Canada. Together with its subsidiaries, CGC engages in the production, distribution, and sale of cannabis in Canada.

8.     Defendant Mark Zekulin ("Zekulin") served as CGC's President since before the start of the Class Period until June 27, 2018, when he was additionally named Co-Chief Executive Officer ("CEO") of the Company. He served in this capacity until July 3, 2019, when he became sole CEO of the Company. Following Zekulin's transition to sole CEO, he stepped down as CGC's President.

9.      Defendant Bruce Linton ("Linton") is the founder of CGC, and served as the Company's Chairman and CEO until June 27, 2018, when he became Co-CEO of the Company. Linton served as Co-CEO until July 3, 2019.

10.      Defendant Mike Lee ("Lee") was appointed the Company's acting Chief Financial Officer on June 1, 2019, and thereafter has served in this role on a permanent basis.

11.      Defendant Tim Saunders ("Saunders") served as the Company's Executive Vice President and Chief Financial Officer during the Class Period until June 1, 2019.

12.      The Defendants referenced above in ¶¶ 8 - 11 are referred to herein as the "Individual Defendants" and together with the Company may be collectively referred to as "Defendants."

13.      The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of the Company's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company, and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false and misleading statements pleaded herein.

14.      Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CGC securities by disseminating

3

materially false and misleading statements and/or concealing material adverse facts.   The scheme: (i) deceived the investing public regarding CGC's business, operations, management and the intrinsic value of CGC securities; (ii) enabled Defendants to artificially inflate the price of CGC shares; (iii) enabled CGC insiders to use Company stock as currency to acquire revenues through CGC's stock-based acquisitions (for example, of Daddy Cann Lesotho PTY Ltd. and Hiku Brands Company, Ltd.) during the Class Period while in possession of material adverse non-public information about the Company; and (iv) caused Plaintiff and other members of the Class to purchase CGC securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the securities of CGC between **September 8, 2017 and November 13, 2019**, inclusive (the "Class"), and who were damaged thereby. Excluded from the Class are the Individual Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.    The members of the Class are so numerous that joinder of all members is impracticable. CGC securities began trading on the NYSE under the ticker symbol "CGC" on May 24, 2018.  Prior to that, the Company's securities traded publicly under the ticker symbol "WEED" on the Toronto Stock Exchange ("TSX") and under the ticker symbol "TWMJF" on the OTC Pink market ("OTC"). The Company's securities continued to trade on the OTC until the market close on May 23, 2018, after which those shares began trading on the NYSE. The Company's securities continue to trade on the TSX.  As of September 30, 2019, there were

approximately 347,226,921 outstanding common shares of CGC. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by CGC and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CGC; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background to the Class Period / Relevant Corporate Background

21.     According to the Company's profile listed on *Yahoo.com/finance*, CGC operates through two segments: Cannabis Operations and Canopy Rivers.  The Company's product offering includes dried flowers, oils and concentrates, softgel capsules, and hemps, and the Company offers its products under the Tweed, Spectrum, DNA Genetics, CraftGrow, Tokyo Smoke, DOJA, Van der Pop, and Maitri brands. The Company also provides growth capital and a strategic support platform that pursues investment opportunities in the global cannabis sector.

22.     On April 13, 2017, the Canadian Federal Government tabled legislation that aimed to legalize regulated recreational cannabis in Canada. On June 19, 2018, the Canadian Senate voted to effectively legalize the recreational use and consumption of cannabis. And on or about October 17, 2018, the Canadian recreational cannabis market launched.

### Defendants' Materially False and Misleading Statements Made During the Class Period

23.     The Class Period commences on September 8, 2017.  That day, CGC issued a press release, entitled "Tweed Farms To Expand Three-Fold To Over One Million Square Feet Of Greenhouse Space Under Glass," which stated, in part, that the Company "finalized the purchase of a parcel of land adjacent to its current facility in Niagara-on-the-Lake, ON including an operational 458,000 sq. ft. greenhouse." Defendant Linton was quoted in the press release, touting that the Company "see[s] a *long-term need for a diversified and **exponentially larger***

6

*footprint here in Canada* balancing indoor and greenhouse growing platforms," and that "[e]xpanding the production capacity and greenhouse space at Tweed Farms allows us to **continue to grow into the demand in the market**, and showcase our best-in-class sun-grown products."[1]  This press release also noted that CGC's wholly-owned subsidiary, Tweed Farms, Inc., would "*continue to grow* and harvest a variety of genetics to support *growing demand* for dried flower, oil, and Softgel capsule cannabis products."

24.     That same day, the Company issued another press release entitled "Canopy Growth Responds To Ontario Governments Announcement On Retail Cannabis Framework," wherein the Company touted its "Future Growth in Ontario," stating, in pertinent part:

> We are currently Canada's largest producer, and are *committed to expanding throughout the coming years to meet the demand this system will create,* while ensuring our medical patients receive priority access to cannabis. Just this morning we announced that our Tweed Farms facility in Niagara-on-the-Lake will house a million square feet of greenhouse space – tripling the current size, which is already the largest legal cannabis greenhouse in the world. Our focus going forward will be to fill store shelves, and to do that we will *continue to expand* our footprint in Ontario, across the country, and around the world.

25.     On June 28, 2018, the Company filed an Annual Report on Form 40-F with the SEC, which included as exhibits an Annual Information Form, Consolidated Financial Statements, and a Management's Discussion and Analysis of the Financial Condition and Results of Operations (collectively, the "June 28, 2018 Form 40-F"), and which reported the Company's financial and operating results for the quarter and year ended March 31, 2018. For fiscal 2018, the Company reported a net loss of C$70.35 million, or C$0.40 per diluted share, on revenue of C$77.95 million, compared to a net loss of C$7.52 million, or C$0.06 per diluted share, on revenue of C$39.9 million for fiscal 2017.[2]

---

[1]     Unless otherwise indicated, all emphasis is added.
[2]     References to "C$" represent figures in Canadian dollars.

26.     The June 28, 2018 Form 40-F further noted the Company's adjusted EBITDA for the fiscal year 2018 amounted to a loss of C$41.25 million, compared to a loss of C$4.72 for fiscal 2017. Additionally, with respect to International Financial Reporting Standards ("IFRS") non-cash accounting related to biological assets and inventory, the Company reported fair value changes in biological assets included in inventory sold and other inventory charges of C$66.27 million for fiscal year 2018, compared to $C34.98 million for fiscal year 2017, and unrealized gain on changes in fair value of biological assets of C$(100.30) million for fiscal year 2018, compared to C$(49.09) million for fiscal year 2017.

27.     The June 28, 2018 Form 40-F noted that inventories of the Company's products were being scaled to meet expected market demand due to the legalized recreational market expected later that year. For example, in discussing Fourth Quarter 2018 Revenue and Operational Highlights, the Company noted:

> At quarter end the Company held inventory of 15,726 kilograms of dry cannabis, 6,969 litres of cannabis oils, ranging from concentrated resins, or refined oil, to finished oil, and 356 kilograms softgel capsules, *inventories are continuing to be scaled to meet management's expectation of market demands, including the legalized recreational market expected later in calendar 2018.*

Similarly, in describing the Company's quarterly results, the Company noted:

> During the three months ended March 31, 2018, the Company harvested 4,811 kilograms. In comparison, during the three months ended March 31, 2017, the Company harvested 1,980 kilograms. *The Company is ramping up production and inventories for later in calendar 2018 when the legalized recreational market is expected to commence to meet expected demand from consumers and the provinces.*

28.     In describing the Company's Results of operations for the year ended March 31, 2018, the June 28, 2018 Form 40-F provided, in part:

> Total revenue for the year ended March 31, 2018 was $77,948 representing a 95% increase over the year ended March 31, 2017.

The Company believes the sale of cannabis oils will represent a significant revenue stream going forward. In the year ended March 31, 2018 and 2017, oils, including gel caps, accounted for 22% and 12% of product revenue, respectively.

The total quantity of cannabis sold during the year ended March 31, 2018 was 8,708 kilograms and kilogram equivalents at an average price of $8.24 per gram, up from 5,139 kilograms and kilogram equivalents at an average price of $7.40 in same period last year due to an increasing mix of oil products and oil-based soft gel caps being sold as well as the increasing Germany sales.

29.    In describing the legalization of the recreational cannabis in Canada, the

June 28, 2018 Form 40-F provided, in part:

> *CIBC World Markets reports estimates of the potential value of the regulated recreational cannabis market in Canada range from $5.0 billion to $10.0 billion per year.* The lower market value of $5.0 billion per year translates into yearly consumption of 770,000 kilograms of cannabis, assuming a price of approximately $6.50 per gram.[] To put the potential size of the Canadian regulated recreational market in context, Statistics Canada valued the beer market in Canada, in 2014, at $8.7 billion.[]

> * * *

> The Government is targeting implementation over eight to twelve weeks. As expected, Canadian Licensed Producers ("LP"), which currently supply the medical marijuana market, will also be responsible for supplying marijuana to the regulated recreational market.

> Canopy Growth looks forward to continued discussion on this topic as regulations are developed. The legislation does not prescribe specific limitations other than details on overly promotional language or targeting youth. . . .

> Federal legislation, once created, will enable provinces to distribute and retail Cannabis. Each Canadian province and territory is preparing for the sale and distribution of cannabis for regulated recreational. *Management believes that the revenue generating opportunities and economic development potential of the control and sale of cannabis for regulated recreational is not lost on provinces.*

> At the onset of the regulated recreational cannabis market, permitted products will be the same as what is currently offered in the medical cannabis market – dried flowers, oils and soft-gel. As this product offering represents only a portion of the products available on the illicit market, *the federal government has indicated that value-added products including higher concentrated oils and*

> *ingestibles will be permitted for sale within a year of the opening of the regulated recreational cannabis market.*

30.     The June 28, 2018 Form 40-F further touted the Company's "Positioning For the Canadian Regulated Recreational Market" and its focus on future growth, by stating, in part:

> Early in the development of the Company's plan to enter the future Canadian Regulated Cannabis Market, management realized that securing channels to market was equally, if not more, important than licensed cultivation capacity, as distribution drives revenue while capacity alone does not. *Management has invested significant effort in securing channels into the future regulated recreational markets across Canada.* With the provincial liquor agencies being given responsibility for establishing distribution and retail frameworks focused the majority of its management outreach on building relationships with these agencies. To aid in this effort, the Company hired a government relations team with significant direct liquor agency experience.

> \* \* \*

> To position the Company to confidently secure primary supplier contracts with all of the provincial liquor agency, *the Company has invested significant resources to establish the largest cannabis inventory and in-production licensed capacity by early calendar 2018.* At March 31, 2018, management believes the Company had the largest inventory of harvested product and biological assets with a value exceeding $118,000. As of June 27, 2018, management believes the Company has the largest licensed and in production platform in Canada, at over 2.4 million sq. ft. In addition, the Company expects to have up to an additional 3.2 million sq. ft. to enter production over the next year ended. *With the combination of the sector's largest inventory and the Company's vast production platform, management believes the Company is well positioned to secure large supply channels into the regulated recreational market and ultimately supply a significant portion of that market.*

> The Company's CraftGrow program discussed elsewhere, which assists smaller local/regional Licensed Producers in getting their product to market, provides additional value-added consideration should provincial liquor control agencies seek the flexibility to showcase products of local/regional Licensed Producers within a trusted supply agreement with a larger producer.

> With renowned cannabis brands (Tweed, Leafs By Snoop & DNA Genetics), strong customer and online communication, substantial product variety, investment in the development and execution of marketing, and retail programs and investment in a business to business sales function, *management believes consumer demand for the Company's products will be strong.*

With licensed cultivation and production operations in Ontario, Saskatchewan, Quebec and British Columbia as well as announced development plans spanning Alberta, New Brunswick and Newfoundland & Labrador, Canopy Growth has made meaningful economic development commitments in various provinces. *Management believes that economic development commitments will be one of the many factors that influence cannabis supply related decisions made by the provinces.*

Management believes large scale Licensed Producers are well positioned to support the provinces in their efforts to establish, oversee and implement physical and online cannabis retail. The Company, with comprehensive standard operating procedures for secure cultivation, production, storage and transportation of Cannabis and significant, highly secure vault storage capacity in place or under development in multiple locations across the country, is well positioned to assist provincial agencies with the provisioning of secure cannabis storage and transportation. *With the largest customer base in the legal Canadian cannabis market and broadest product portfolio in the sector, the Company can offer provincial agencies/crown corporations/retailers with significant consumer product demand intelligence to assist with product selection.*

\* \* \*

Management believes the large product volumes that will shipped to the provincial and territorial agencies will require large capacity and increasingly efficient cannabis packing and shipping capabilities. *In the fourth quarter of fiscal 2018, the Company began the development of a dedicated distribution centre. This centre has been designed to significantly increase the capability and flexibility of the company's fulfillment resources.* The Company is also investing significant resources in the research and development of automated systems.

The provincial and territorial agencies are being tasked with implementing and managing the distribution and, in many cases, the retail of cannabis products. As management functions within the liquor agencies and new staff being hired to support the rollout of cannabis distribution and retail likely have limited previous experience/knowledge of the product, Management believes significant in market sales support and education will be required. The Company has established a sales management and in market support team and programs to educate and prepare retail staff. To date, the Company has entered into agreements with the liquor agencies in New Brunswick and Prince Edward Island for the development and delivery of education programs.

As highlighted earlier, Canopy Growth believes that, in certain provinces, it will take two years and possibly longer to rollout the full network of regulated cannabis retail stores that is required to satisfy consumer demand. As such, Canopy Growth believes that most of the sales in the first two years of the regulated recreational market will go through provincial online sales. With less

than 6 months to establish a robust online retail system and cannabis marketplace, management expects that certain, if not many, provinces could benefit from leveraging the existing online ecommerce, customer demand data and transactional information technology systems that have been deployed by the Company. The Company's Tweed Main Street online store (See Overview of Canopy Growth Corporation, Tweed Main Street), a single online marketplace offering cannabis for sale from multiple producers across numerous brands – delivering a shopping experience that consumers expect, is uniquely suited to deliver the online retail experience that provincial agencies/crown corporations/retailers will be expected to deliver.

31.     The June 28, 2018 Form 40-F further noted the Company's costs of sales and the

effect that these costs, and other inventory charges, had on gross margins:

During the three months ended March 31, 2018, the Company harvested 4,811 kilograms. In comparison, during the three months ended March 31, 2017, the Company harvested 1,980 kilograms. *The Company is ramping up production and inventories for later in calendar 2018 when the legalized recreational market is expected to commence to meet expected demand from consumers and the provinces.*

The net cost of sales of $15,629 during the three months ended March 31, 2018 was comprised of inventory production costs expensed to cost of sales of $14,289, fair value changes in biological assets included in inventory sold and other inventory charges of $19,929 offset by the unrealized gain on changes in the fair value of biological assets of $18,589. The impact of changes in the fair value of biological assets recorded during the quarter was due in large part to the full utilization of Tweed Farms in Niagara-on-the-Lake and part utilization of BC Tweed offset by a lower amount of biological assets at Smiths Falls, Ontario as 7 of the 24 flower rooms at that facility were re-purposed, for clone propagation for other sites and the preparation of a large footprint pre-pack room, which reduced growing capacity for commercial harvest. . . .

The inventory production costs expensed to cost of sales of $14,289 is principally comprised of the cash costs of the inventory sold in the period of $8,397 and $5,892 of cash operating costs of subsidiaries not yet cultivating or selling cannabis, such as BC Tweed, Vert Mirabel, Tweed 53 (Edmonton, Alberta) and Spot Therapeutics (Fredericton, New Brunswick). This compares to the same period last year when the inventory production costs expensed to cost of sales of $5,603 was comprised of the cash costs of inventory sold in the period of $5,514 and $89 of cash operating costs of subsidiaries not yet cultivating or selling cannabis.

* * *

The fourth quarter Fiscal 2018 gross margin before the effects of IFRS fair value impacts in cost of sales and other inventory charges, and excluding the costs of non-cultivating subsidiaries and assets, totaling $5,892, was $14,409 or 63% of sales.

The fourth quarter Fiscal 2018 gross margin before the effects of the IFRS fair value impacts in cost of sales and other inventory charges was $8,517 or 37% of sales, as compared to $9,058 or 62% of sales in the fourth quarter of last year. The lower gross margin percentage was due primarily to the impact of cash operating costs of subsidiaries not yet cultivating or selling cannabis, described earlier in this MD&A.

The IFRS reported gross margin was $7,177 or 31% of revenue, for the three-month period ended March 31, 2018. In the comparative period ended March 31, 2017, the gross margin on the same basis was $2,499 or 17% of revenue. Gross margin includes the fair value changes in biological assets included in inventory sold and other inventory charges and unrealized gain on changes in fair value of biological assets.

32.     The June 28, 2018 Form 40-F further noted the impact the Company's inventory had on liquidity:

The increase in total working capital to $389,749 (March 31, 2017 - $154,941) *was primarily due to the increase in inventory*, the investment in the Company by an affiliate of Constellation Brands, gross proceeds of $200,700 from the February 2018 bought deal financing and the cash raised by Canopy Rivers which was consolidated in the financial statements.

* * *

At March 31, 2018, inventory quantities amounted to 15,726 kilograms of dry cannabis. Of this amount, 2,982 kilograms was finished goods available for sale; 3,480 kilograms of product in process of testing and awaiting release for sale, and 9,264 kilograms of extract-grade cannabis held for conversion to oils and capsules. This compares to March 31, 2017 when a total of 8,360 kilograms of dry cannabis was in inventory, comprised of 377 kilograms of finished goods, 3,173 kilograms of product awaiting approvals to be released for sale, and 4,810 kilograms of extract-grade cannabis being held for conversion to oils and to capsules. In addition, the Company had a total of 6,969 litres of cannabis oil, ranging from concentrated resins, or refined oil, to oil in its finished state and available for sale, up from 1,799 litres held at March 31, 2017, also ranging from concentrated resins to finished oils available for sale.  The Company also had 356 kilograms of capsules on hand at March 31, 2018.

Inventory at March 31, 2018 amounted to $101,607 (March 31, 2017 - $45,981)

and biological assets amounted to $16,348 (March 31, 2017 - $14,725), together totaling $117,955 (March 31, 2017 - $60,706) *all of which Management believes is required to meet expected market demands, including the legalized recreational market expected later in calendar 2018.*

The increase in inventory since March 31, 2017 was due to the new grow rooms coming on line at Smiths Falls, having Spectrum operations integrated and online, and the harvests at the Company's greenhouse in Niagara-on-the-Lake. Harvested plants were added to inventories during the quarter and quantities maintained to meet the growth in sales expected and meet strain availability requirements, and the expansion of oils.

33.    In addition to the foregoing, the June 28, 2018 Form 40-F contained certifications, pursuant to 18 U.S.C. section 906 of the Sarbanes-Oxley Act of 2002 (hereinafter "SOX"), signed by Defendants Linton and Saunders that purported to attest to the accuracy and completeness of the Company's financial and operational results.

34.    On June 20, 2019, the Company issued a press release announcing its Fourth Quarter and Fiscal 2019 results.  The press release provided, in part:

Fiscal year 2019 was a year of continued expansion across key markets, including major steps towards completion of the Company's build-out in Canada. *Management believes that the strategy of investing early in large-scale, high quality Canadian production assets and significant value-add infrastructure has been validated during the second half of fiscal 2019 as the majority of the Company's production platform became licensed and operational, with further improvements in output expected as full ramp-up of facilities is completed.* In the current quarter, Canopy Growth expects to harvest approximately 34,000 kilograms, with further licensed capacity, ramp-up and efficiencies anticipated. *The Company's strategy has resulted in, to its knowledge, the largest market share in the Canadian cannabis market.*

And Defendant Linton was quoted therein as follows:

"The fourth quarter wraps up a historic year with major steps taken in Canada to build-out our national platform while scaling all of our processes to bring cannabis to market. The third quarter of the year benefitted from months of advanced production while the fourth quarter relied more on efficient throughput and a more automated platform," said Bruce Linton, Chairman and Co-CEO of Canopy Growth. "With more product formats coming to the Canadian market later in the year, we are working hard to ensure that we are ready to hit the ground running with products, formats and brands that Canadians trust."

14

35.     The June 20, 2019 press release further described the Company's "Gross Margin (before the IFRS fair value impacts in cost of sales)[] Overview" as follows:

> Gross margin (before the IFRS fair value impacts in cost of sales) for fiscal 2019 grew 35% to $51 million, driven by growth in our medical channel and the launch of the Canadian recreational channel. The gross margin percentage decreased during the year from 48% to 22%, largely driven by the continued expansion work on several of our large-scale greenhouse facilities throughout the year, resulting in underutilization impact in cost of sales. The impacts of under-utilization continued into Q4, resulting in a gross margin percentage of 16%, which is down from 34% in the corresponding period from the prior year, and 22% in Q3. The impact in Q4 fiscal was primarily attributed to $24 million of operating expenses for facilities not yet cultivating, cultivating but not yet harvesting, or facilities that had under-utilized capacity. Additionally, Q4 incurred some non-recurring costs related to an unusual weather event and other onetime activities. We expect these facilities to be fully operational in the months ahead, resulting in a return to normalized operating costs for our cultivation facilities.
>
> As production ramp-up begins for the next generation of recreational products, there will be costs related to the ramp-up of advanced manufacturing that will impact reported gross margin during the initial startup phase, but management expects the impact to be less material relative to the size and scale of the revenue related to the new generation of products.
>
> Inventory production costs expensed to cost of sales in fiscal 2019 were $175.4 million, as compared to $40.2 million in fiscal 2018. The impact of changes in the fair value of biological assets in fiscal 2019 was due in large part to the commencement of growing at the Company's facility in Mirabel, Quebec increased utilization at our facilities in Aldergrove and Delta, British Columbia, and 27 new grow rooms at the facility in Smiths Falls, Ontario.

36.     The June 20, 2019 press release further touted the Company's efforts to scale its business:

> [The Company] continues to make *significant investments to scale our business in Canada and globally, including investments building our corporate capabilities, developing our production infrastructure, investing in the marketing and development of new value-added consumer products for the Canadian recreational cannabis market as well as the global CBD market.* Work is underway to bring these new consumer products to these markets towards the end of fiscal 2020. Additionally, the Company continues to invest in the development and expansion of medical cannabis operations in jurisdictions outside of Canada including Colombia, Spain, Germany, Denmark, Lesotho, South Africa and

Australia.

37.     In describing its Balance Sheet Highlights, the June 20, 2019 press release provided:

> Inventory at March 31, 2019 amounted to $262.1 million (March 31, 2018 - $101.6 million), including $38 million in finished goods and $165.5 million of work-in-progress. In addition, biological assets amounted to $79 million, which together with inventory totaled $341.1 million. The Company has scaled production and increased automation capacity and expects to achieve a Q1 fiscal 2020 harvest of approximately 34,000 kilograms which is expected to be available for sale in all channels starting in Q2 fiscal 2020.

38.     And, in describing Fourth Quarter and Fiscal Year 2019 Adjusted EBITDA summary, the June 20, 2019 press release provided:

> Adjusted EBITDA amounted to a loss of $257.0 million in fiscal 2019, as compared to a loss of $36.1 million in fiscal 2018. The year-over-year loss is largely reflective of the investments made in fiscal 2019 sales and marketing, and general and administration costs as described above.

39.     On June 26, 2019, the Company filed an Annual Report on Form 40-F with the SEC, which included as exhibits an Annual Information Form, Consolidated Financial Statements, and a MD&A (collectively, the "June 26, 2019 Form 40-F"), and which reported the Company's financial and operating results for the quarter and year ended March 31, 2019. For fiscal year 2019, the Company reported a net loss of C$685.44 million, or C$2.57 per diluted share, on revenue of C$226.34 million, compared to a net loss of C$70.35 million, or C$0.40 per diluted share, on revenue of C$77.95 million for fiscal year 2018.

40.     The June 26, 2019 Form 40-F further noted the Company's adjusted EBITDA for the fiscal year 2019 amounted to a loss of C$256.96 million compared to an adjusted loss of C$36.07 million for fiscal 2018. Additionally, with respect to IFRS non-cash accounting related to biological assets and inventory, the Company reported fair value changes in biological assets included in inventory sold and other inventory charges of C$129.54 million for fiscal year 2019,

16

compared to $C67.86 million for fiscal year 2018, and unrealized gain on changes in fair value of biological assets of C$(167.55) million for fiscal year 2019, compared to C$(96.72) million for fiscal year 2018.

41.     In the June 26, 2019 Form 40-F, in discussing the Company's Fiscal 2019 Operational and Financial Highlights, the Company touted the Company's sales as follows:

> The total quantity of cannabis sold during fiscal 2019 was 24,320 kilograms and kilogram equivalents at an overall average price of $7.91 per gram, up from 8,708 kilograms and kilogram equivalents in fiscal 2018 but down from $8.24 per gram in fiscal 2018. *The increase in kilogram and kilogram equivalents sold was due to the launch of the Canadian recreational market on October 17, 2018.*
>
> Recreational cannabis accounted for 16,250 kilogram and kilogram equivalents sold in fiscal 2019 (67% of total cannabis sold), of which 84% was sold directly to the Canadian provinces and the remainder through our direct retail and on-line consumer channels. Medical cannabis accounted for 8,070 kilogram and kilogram equivalents in fiscal 2019 (33% of total cannabis sold), representing a decrease of 7% from the 8,708 kilogram and kilogram equivalents sold in fiscal 2018 due largely to repositioning to more limited medical-focused Spectrum brand offerings and product availability for the on-line store, and to the cross-over effects attributable to the newly-available recreational offerings.
>
> The average selling price per gram, net of excise tax, was $7.91 in fiscal 2019, a decline from $8.24 in fiscal 2018 due primarily to the wholesale pricing which we realized when selling to the provincial crown corporations in the recreational market, partially offset by the higher average pricing realized in the retail channel.
>
> *We harvested 46,927 kilograms of cannabis in fiscal 2019, as compared to 22,513 kilograms harvested in fiscal 2018. The increase is attributable to the build-out of our production capability over the last fiscal year in preparation for the launch of the Canadian recreational market.*

42.     The Company further noted that its revenue from recreational cannabis sales in fiscal 2019 increased from fiscal 2018 "entirely due to the launch of the Canadian recreational cannabis market in October 2018" and that "[o]ils, including [the Company's] softgel capsules, accounted for 23% of net revenues in fiscal 2019."

43.     In the June 26, 2019 Form 40-F, the Company noted its costs of sales and the

impact in gross margins:

> Inventory production costs expensed to cost of sales in fiscal 2019 were $175,425, as compared to $40,213 in fiscal 2018. In fiscal 2019, these costs were primarily comprised of the costs of recreational and medical cannabis sold in the period, and operating costs related to the operating costs of facilities which were not yet fully cultivating or had unutilized capacity, including the Delta greenhouse, a number of zones at the Aldergrove greenhouse, the Mirabel greenhouse which was in a pilot phase for the majority of the fiscal year, and the greenhouse in Fredericton, New Brunswick which was in a start-up phase.

> The impact of changes in the fair value of biological assets in fiscal 2019 was due in large part to the commencement of growing at Mirabel, increased utilization at our greenhouses in Aldergrove and Delta, and new grow rooms at Smiths Falls.

> Gross margin before fair value impacts in cost of sales for fiscal 2019 was $50,916, or 22% of net revenue. Comparatively, in fiscal 2018 gross margin before fair value impacts in cost of sales was $37,735, or 48% of net revenue. The lower gross margin percentage in fiscal 2019 was primarily attributable to the impact of operating costs of $49,564 relating to facilities not yet cultivating or which had unutilized capacity, the lower average wholesale selling price in B2B channels in the recreational market, and absorbing early costs associated with developing and testing edibles and beverages for introduction later in calendar 2019. At our greenhouse facilities in Aldergrove, Delta and Mirabel, we have the ability to plant in a manner that allows for ongoing harvests, rather than one large harvest; *this will allow for the increased utilization of assets for post-harvest processes and provide for a steady supply of product going forward.*

> The IFRS reported gross margin for fiscal 2019 was $88,930 or 39% of net revenue, as compared to $66,595 or 85% of net revenue in fiscal 2018. The IFRS gross margin was impacted by operating costs associated with facilities that were not cultivating cannabis or that had unutilized capacity, as described above, and the destruction of plants in the second quarter of fiscal 2019 due to delays in infrastructure and regulatory approvals for post-harvest processing licenses at our Delta greenhouse. These factors were partially offset by the impact of changes in the fair value of biological assets, as described above.

44.     In addition to the foregoing, the June 26, 2019 Form 40-F contained certifications, pursuant to SOX, signed by Defendants Linton, Zekulin, and Lee that purported to attest to the accuracy and completeness of the Company's financial and operational results.

45.     On July 3, 2019, the Company issued a press release announcing a "leadership transition," wherein the Company and Defendant Linton jointly "announced" that Defendant

Linton would "step down" as co-CEO and Defendant Zekulin would become the sole CEO of the Company and would work "to identify a new leader to guide the [C]ompany in its *next phase of growth[.]*"

46.     As further outlined, *infra*, the foregoing statements made by Defendants, and referenced in ¶¶ 23-45, were each materially false and misleading when made, and were known by Defendants to be false or were recklessly disregarded as such thereby, at that time, for the following reasons, among others:

   a.  At all times during the Class Period, the Company materially exaggerated and/or overestimated the potential market for its products;

   b.  At all times during the Class Period, the Company's stated growth plans were incongruous with the revenue and demand it was realizing and would reasonably produce;

   c.  At all times during the Class Period, the Company failed to properly account for inventory and demand for its products, which ultimately resulted in massive write-offs and restructuring charges;

   d.  At all times during the Class Period, these statements and/or omissions were reasonably likely to have a material negative impact on the Company's financial and operational results;

   e.  As a result of the aforementioned adverse conditions, which Defendants failed to disclose, throughout the Class Period, Defendants lacked any reasonable basis to claim that CGC was operating according to plan, or that CGC could achieve the guidance sponsored and/or endorsed by Defendants.

**The Truth Emerges**

47.     As noted above, on July 3, 2019, the Company issued a press release announcing a "leadership transition," wherein the Company and Defendant Linton jointly "announced" that Defendant Linton would "step down" as co-CEO and Defendant Zekulin would become the sole CEO of the Company and would work "to identify a new leader to guide the [C]ompany in its *next phase of growth[.]*"

48.     However, despite this gauze of normalcy and amicability, later in the day on July 3, 2019, *Rolling Stone* published an article, entitled *"Co-CEO of Canadian Weed Giant Canopy Growth Says He Was Fired,"* in which it reported that Defendant Linton "said he was fired" and quoted Defendant Linton as saying: "I think stepping down **might not be the right phrase**. I was terminated."[3] The article further noted that Defendant Linton's termination came "one month after [the Company] reported hefty losses and dwindling weed sales in Canada." An article on *Reuters*[4] also reporting on Defendant Linton's termination quoted a market analyst as saying: "[w]e believe there may have been a disconnect between the near-term execution sought by Constellation [Brands][5] at this point and Linton's focus on investing for the longer term, often at the expense of short-term performance."

49.     That Defendant Linton was terminated – rather than leaving amicably – was a big deal. That is because, in addition to being the Company's co-founder and former co-CEO, Defendant Linton is often independently heralded as a "pioneer" of the cannabis industry, an

---

[3]     Jon Blistein, *Co-CEO of Canadian Weed Giant Canopy Growth Says He Was Fired*, ROLLING STONE (July 3, 2019), https://www.rollingstone.com/culture/culture-news/bruce-linton-canopy-growth-ceo-fired-marijuana-855361/.

[4]     Debroop Roy, *Canopy Growth co-CEO Bruce Linton says he was fired*, REUTERS (July 3, 2019), https://in.reuters.com/article/us-canopy-growth-ceo/canopy-growth-co-ceo-bruce-linton-says-he-was-fired-idINKCN1TY1HV.

[5]     The *Reuters* article reported that Constellation Brands owned an approximate 56% stake in CGC and controlled four of the six members of the Company's Board of Directors.

industry that he has helped build after starting and building CGC from an abandoned chocolate factory into the world's largest cannabis company.[6]  Defendant Linton has frequently spoken to and/or has been interviewed by cannabis industry and market analysts on behalf of CGC, has partnered CGC on ventures with celebrities such as Snoop Dogg, Seth Rogen, and Martha Stewart, and has also been featured as a headline speaker at numerous industry events, including the 2019 World Cannabis Congress.[7]  Indeed, following his termination from CGC, Linton serves as a special advisor, investor, and/or executive to several U.S.-based cannabis companies.[8]

50.    Unsurprisingly, then, news of Defendant Linton's termination – rather than amicable agreement to "step down" so that others could focus on the Company's alleged "next phase of growth" – signaled to the market that something may indeed be wrong with CGC's oft-touted "growth" strategy, which caused shares of CGC to tumble 16.7% from a high of $41.07 per share on July 3, 2019 to a closing price of $34.21 per share on July 12, 2019, with trading volume of over 40 million shares:

---

[6]    Susan Berfield & Kristine Owram, *Canada's Got 'A Guy'*, BLOOMBERG BUSINESSWEEK (June 19, 2019, 5:00 AM), https://www.bloomberg.com/features/2019-canopy-cannabis-bruce-linton-canada-weed/.

[7]    *Id.*; WORLD CANNABIS CONGRESS, http://worldcannabiscongress.com/speakers/ (last visited Jan. 17, 2020).

[8]    Ryan T., *Bruce is Back: Linton Makes His Highly Anticipated Return to the Cannabis Sector*, THE CANNABIS INVESTOR (Sept. 17, 2019), https://www.thecannabisinvestor.ca/bruce-is-back-linton-makes-his-highly-anticipated-return-to-the-cannabis-sector/.



51.     Then, on November 14, 2019, the other shoe finally dropped when the Company

issued a press release announcing its financial results for the Second Quarter of fiscal year 2020,

which ended on September 30, 2019. Therein, the Company reported revenue that fell below

analysts' estimates and an EBITDA loss of C$155.7 million. The Company further announced

that quarterly revenue was up 6%, but that *net of the portfolio restructuring costs, revenue was*

*C$76.6 million, a decrease of 15% over Q1 2020.*   The Company explained the restructuring as

follows:

> *As part of a management-initiated portfolio review, the Company has taken a*
> *restructuring charge of $32.7 million for returns, return provisions, and pricing*
> *allowances primarily related to its softgel & oil portfolio. Additionally,*
> *management has recorded an inventory charge of $15.9 million to align the*
> *portfolio with the new strategy. This new strategy includes new retail pricing*
> *architecture, a rationalized package assortment, and a focused*
> *marketing/educational strategy to further develop this category. The Q2 2020*
> *gross margin impact of the portfolio restructuring costs is $40.4 million.* With
> this acute restructuring charge, management believes that current inventory levels
> both internally and externally are in-line with demand forecasts.

The November 14, 2019 press release provided the following commentary from Defendant

Zekulin: "The last two quarters have been challenging for the Canadian cannabis sector as

provinces have reduced purchases to lower inventory levels, retail store openings have fallen short of expectations, and Cannabis 2.0 products are yet to come to market."

52.     Also on November 14, 2019, the Company hosted an earnings call to discuss the Company's results for the Second Quarter of fiscal year 2020.   Therein, Defendant Zekulin blamed the disappointing financial results on the Canadian government and the lack of licensed retail outlets, stating, in part:

> *I think it is fair to say it's been a challenging **couple of quarters** in the cannabis sector.*
>
> So I would like to first address that head on; second, speak to what we, as a company, have done this quarter to adjust to some of these short-term challenges; and third, reinforce our view that, over our medium-term and despite the current climate, we feel exceptionally bullish on how Canopy is set up to win. So firstly, the big picture. To be clear, there is still an emerging global cannabis opportunity with hundreds of billions of dollars across the medical, pharmaceutical, CBD and recreational cannabis. However, we know the bellwether remains what is happening in the Canadian recreational market.
>
> It is the first national, federally legal, large-scale market opportunity for the sector to execute upon. *And the market opportunity today is simply not living up to expectations and that this risk of oversimplifying the inability of the Ontario government to license retail stores right off the bat has resulted in **half of the expected market in Canada simply not existing**. Ontario represents 40% of the country's population yet has one retail cannabis store for 600,000 people. When one year into the market, the addressable market is **nearly half what is expected**, there is going to be meaningful short-term problems.*
>
> So as a company, we're pleased to see the recent announcement that Ontario has made a commitment to move toward an open allocation of retail licenses, where the number of stores will only be limited by market demand. This is a big deal, but it cannot come soon enough. *And there is sufficient supply for an orderly store rollout to happen now as it did in Alberta over the past year. And until this happens, the cannabis sector cannot reach its full sales potential and cannot convert consumers from the illicit market into the legal market.*

53.     Defendant Zekulin further noted the impact of inventory accumulation in the market and the impact that the restructuring had on the Company's gross margins:

> [W]e have witnessed a slowdown by some provincial buyers in the recreational

channel as they rightsize their own inventory levels after significant inventory accumulation. . . .

* * *

 . . . after our detailed business review, we have concluded that it is appropriate to reflect returns, return provisions and inventory adjustments, which Mike will expand upon later. Management believes that these are extraordinary measures that, now taken, will not occur again and that inventory and production levels across all products are now within an appropriate range as we look ahead to future quarters. Obviously, these abnormal restructuring items had a distorting impact on our gross margin to the tune of $40.4 million.

54.     On this news, CGC's share price fell $2.66 per share, or 14.38%, from its closing price of $18.50 per share the prior day, to close at $15.84 per share on November 14, 2019, and continued to decline to a closing price of $14.22 per share on November 18, 2019:



## CAUSATION AND ECONOMIC LOSS

55.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market, and a course of conduct that artificially inflated CGC's stock price and operated as a fraud or deceit on Class Period purchasers of CGC's securities by misrepresenting material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Ultimately,

however, when Defendants' prior misrepresentations and fraudulent conduct came to be revealed and was apparent to investors, shares of CGC declined precipitously - evidence that the prior artificial inflation in the price of CGC shares was eradicated. As a result of their purchases of CGC securities during the Class Period, Plaintiff and other members of the Class suffered economic losses (*i.e.*, damages) under the federal securities laws.

56.     By improperly characterizing the Company's financial results and misrepresenting its prospects, the Defendants presented a misleading image of CGC's business and future growth prospects. During the Class Period, Defendants repeatedly emphasized the ability of the Company to engage in essentially limitless growth while at the same time maintaining rational economic discipline. These claims caused and maintained the artificial inflation in CGC's stock price throughout the Class Period and until the truth about the Company was ultimately revealed to investors.

57.     Defendants' false and materially misleading statements had the intended effect of causing CGC's shares to trade at artificially inflated levels throughout the Class Period - reaching a Class Period high of $57.00 per share on October 15, 2018.

58.     In early July 2019, and then on November 14, 2019, however, as investors learned the truth about the Company, shares of CGC collapsed, reaching a 52-week low of $15.19 per share before closing at $15.84 per share on November 14, 2019, the end of the Class Period.

59.     The decline in CGC's stock price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud being revealed to investors and to the market. The timing and magnitude of CGC's stock price decline negates any inference that the losses suffered by Plaintiff and the other members of the Class were caused by changed market

conditions, macroeconomic or industry factors, or even Company-specific facts unrelated to Defendants' fraudulent conduct.

## ADDITIONAL SCIENTER ALLEGATIONS

60.     As alleged herein, Defendants acted with scienter in that each Defendant knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding CGC, their control over, and/or receipt and/or modification of CGC's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CGC, participated in the fraudulent scheme alleged herein.

61.     Defendants were motivated to materially misrepresent to the SEC and investors the true financial condition of the Company in order to: (i) deceive the investing public regarding CGC's business, operations, management and the intrinsic value of CGC securities; (ii) enable Defendants to artificially inflate the price of CGC shares; (iii) enabled CGC insiders to use Company stock as currency to acquire revenues through CGC's stock-based acquisitions (for example, of Daddy Cann Lesotho PTY Ltd. and Hiku Brands Company, Ltd.) during the Class Period while in possession of material adverse non-public information about the Company; and (iv) cause Plaintiff and other members of the Class to purchase CGC securities at artificially inflated prices.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD-ON-THE-MARKET DOCTRINE

62.     At all relevant times, the market for CGC's securities was an efficient market for the following reasons, among others:

a.  CGC's stock met the requirements for listing, and was listed and actively traded on the NYSE national market exchange, a highly efficient and automated market;

b.  As a regulated issuer, CGC filed periodic public reports with the SEC and the NYSE;

c.  CGC regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other media; and

d.  CGC was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

63.     As a result of the foregoing, the market for CGC securities promptly digested current information regarding CGC from all publicly available sources and reflected such information in CGC stock price. Under these circumstances, all purchasers of CGC securities during the Class Period suffered similar injury through their purchase of CGC securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

64.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of CGC who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

65.     Plaintiff has alleged the foregoing based upon the investigation of Plaintiff's counsel, which included a review of SEC filings by CGC, as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **FIRST CLAIM**

### **Violation Of Section 10(b) Of**
### **The Exchange Act And Rule 10b-5**
### **Promulgated Thereunder Against All Defendants**

66.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CGC securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CGC securities and options at artificially inflated prices. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

68.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of CGC as specified herein.

69.     These Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course of conduct as alleged herein in an effort to assure investors of CGC's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about CGC and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of CGC securities during the Class Period.

70.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

71.     Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard

for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

72.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of CGC securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of CGC's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired CGC securities during the Class Period at artificially high prices and were damaged.

73.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that CGC was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their CGC securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

74.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

75.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 20(a) of the Exchange Act Against The Individual Defendants

76.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.     The Individual Defendants acted as controlling persons of CGC within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

78.     In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

79.     As set forth above, CGC and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder, pursuant to Rules 64 and 65 and any appropriate state law remedies to assure that the Class has an effective remedy; and

E.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: January 17, 2020

Respectfully submitted,

*/s/ Melinda A. Nicholson*
LEWIS S. KAHN
MELINDA A. NICHOLSON (MN-6251)
MICHAEL J. PALESTINA
**KAHN SWICK & FOTI, LLC**
1100 Poydras Street – Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
Email: Lewis.Kahn@ksfcounsel.com
Email: Melinda.Nicholson@ksfcounsel.com
Email: Michael.Palestina@ksfcounsel.com

-and-

J. RYAN LOPATKA
**KAHN SWICK & FOTI, LLC**
250 Park Ave., Suite 2040
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
Email: j.lopatka@ksfcounsel.com

**Attorneys for Plaintiff**